Good morning, your honors. To please the court, my name is Ido Rothkin. I represent Gary Fung and ISOHunt. I'd like to reserve five minutes for rebuttal. Okay. Your honors, unlike the Veo case, ISOHunt is a search engine. It does not host any copyrighted content. It only links to bit-torn files. Any copyright infringement that could ever occur would occur off-site and leave ISOHunt behind. In this case, a motion for subject judgment should never have been granted. The district court made errors both in terms of the inducement as well as the DMCA. It also issued an overbroad injunction. The errors include in the inducement the notion that the district court failed to ever consider any kind of element of causation. Now, causation is not overtly mentioned in the Drogster opinion by the Supreme Court, but it's alluded to when they created the rule that says that one's only responsible for the resulting acts of infringement by third parties. Well, this was a summary judgment, so the question isn't what the district court considered it. The question was what the record shows and whether it's adequate. Okay. In terms of whether the record shows whether it's adequate, if we take a look at the notion that the district court never even discussed causation, and if we were just to take a look at some basic fairness or some basic tort law for causation, we would look at a situation where we would say, well, do messages or advertisements regarding inducements say 2003? To what extent could they be dispositive of direct infringements that could have occurred in 2007? One would have to say at least, well, we have to see it as a cause and effect. And that's exactly what happened in this case. If we read the order, Judge Wilson basically analyzed about 15 or so messages that permeate the order, which we call the heap. And none of them were tied together with any direct infringements at all. And when you look further under scrutiny, those 15 or so messages, about 12 of them are before 2005. They were from 2003 and 2004. In another part of the order, in the main place where the analysis is done on what the direct infringements are by users who leave the site, that analysis was done in 2007. And there was no effort at all to conclude anywhere in the order. You could search it all day long to say, what are the infringements that ISO 100 is responsible for? It's not in there. The copyrights ensued are not listed. All that's listed... Are you suggesting that there needs to be some sort of one-on-one causation? You have to demonstrate not that the website in general was promoting infringements and meant to be doing so and was doing so publicly, but also which particular postings were infringing because of it? I would have to say that anything is better than nothing. And if we take a look at common law torts, as, frankly, even the Ninth Circuit has alluded to in looking at Grokster, one would look at proximate cause, one would look at substantial factor. If we just look at basic proximate cause, it certainly raises a triable issue of fact that these balkanized messages that were on these message boards that were three or four years old as to whether or not they're causally related to the direct infringements. But what's even more important is that it's in the record that the court did rely upon these messages as its main thrust of finding inducement. But upon further scrutiny, the traffic to those messages only made up 0.3 percent of the entire site. So the most number of people who could ever actually have seen those messages would be less than 0.3 percent of the total traffic ever to go to ISO 100. That certainly raises a triable issue of fact as to whether or not there's a cause and effect on the messages that litter the order and are never analyzed to see whether or not they really can lead to resulting acts of infringement by third parties. Were there any ñ was there ever a damages aspect of the case? I know there's an injunction. Was there ever a damages aspect? No. We did ask the court if we can go ahead and have an interlocutory appeal before the damages phase, and he did grant it. Okay. So a lot ñ certainly your arguments with respect to causation would play out within the damages context, I suppose. I would say that frankly, Your Honor, in order to have an orderly administration of this case, the way that we think it ought to play out would be first you decide what the direct infringements are or the copyrights in suit. You then take a look to see whether or not there's a DMCA safe harbor. And then if there's not a DMCA safe harbor, you then look to inducement. And inducement can't just be a gestalt order that for all these reasons you're inducing, and you don't list a single copyright that you're inducing on. That doesn't provide for an orderly administration. And frankly, as part of the tort, you do have to actually list at least some infringements that the court is finding you're secondarily liable for. It can't just be that third parties at any point in time arising out of your sight go somewhere else to infringe, and therefore you're liable because of some gestalt sense that at some point you induced. And so we think that the order is defective. We think that we would ask this court to reverse the remand and provide instructions on causation and some sort of unity in time analysis. Okay. Now, as I understand, and I won't pretend to understand. I didn't know what a BitTorrent was until this case. The Internet progresses faster. I just got my iPad nine months ago, and it's obsolete. So with that caveat, my understanding is that at least with regard to your client, he had a site. He has a site, right? Isohunt.com. And he, on that site, he pretty brutally is pushing access or, let's say, access to obviously copyrighted works, top ten, top 20 movies, things like that. And he also has operated a tracker server. Isn't that right? Not the only one available. Yeah, he had two of those. So what you're saying in terms of causation is what, aside from the obvious solicitation or inducement on the face of what he was doing, you want to say also that it has to be tracked to or tied to some particular copyright violation. So in this case, what would you, what more do you think should have happened? All right. There should be some sort of objective, you know, analysis that's commonly done, whether it's in copyright or even in tort cases or even in trademark cases where looking at likelihood of confusion, you get surveys done. You're making the assumption that it's the inducement that has to lead to the causation rather than the device which was created for an inducing purpose. In other words, here you have a system. If there's a finding that the system was created and used with the intent to encourage inducement, and it did in fact encourage inducement, why isn't that good enough? Well, for a number of reasons. First of all, as indicated, only .3 percent of the traffic could have ever seen the main messages. So under any analysis, only .3 percent of the traffic to the website could have ever seen the so-called inducing messages. But that's why you're not taking my posit here or at least telling me why my posit is wrong. My posit wouldn't depend upon the people who got the message were the people who did the inducement. So you wouldn't have to show a line between the inducement and the actual infringement, rather than a line between the inducement and the system and then the infringement. Well, if I understand what you're saying correctly, there needs to be more than intent in order for somebody to be essentially. There is more than intent. There's a whole system as to which there's massive infringement. But there are also substantial non-infringing uses in the record. But there's 95 percent or something. It's huge. It was equivalent to essentially what was going on in Groxer, which is 90 percent, and which Justice Breyer found to be substantial non-infringing uses as a matter of law. Yes, the answer to your question is that there needs to be a causation element. It can't just rely on intent. But there does need to be a causation element. But the question is between what and what. So, for example, here's what I would envision the causation would show. You would basically take a look at the messages, and you could have macro and micro causation. Macro causation would say, did any of the messages increase traffic to the site for inducing reasons? That's not analyzed. We don't know whether or not the traffic went down after those so-called inducing messages were manifested. Did anyone see them? Did people ever, you know, get surveyed, and they could say how they read the messages and what they thought about them? Here's the message. Therefore, you lose. And that's not the basis upon which tort law works. You should only be responsible under tort law for things that actually cause harm. Other things they could do on a microtransactional level would be, do any of the inducing messages lead to the download of so-called infringing works? You could trace it. You can go look at the IP addresses for the folks who were listed in the part of the order that was done for 2007's analysis, and you could subpoena their IP addresses, which the Motion Picture Association is very good at doing. But if we assume that you're right, that on the current record you couldn't show an actual line between inducing messages and specific inducements, you still have to tell us why that's what we're looking for, and that's what you haven't done. Well, I would say that we're looking for that because the Grok's Rule says one is liable for the resulting acts of infringement based upon the promotion of the use. And we don't have the line drawn between the promotion of the use of the device. We don't have a clear expression. And we don't have liable for the resulting acts of infringement by third parties. We also know from the Grokster opinion that they did discuss that the calculus that ought to be done in these cases is derived from common law tort. We also have sort of a practical rule. If we were, if the site was advertising for one day all the pirated video games you want come here, and they did that in 2003, they get sued and they settle with the video game companies, could the Motion Picture Association come along in 2007 and say, oh, you're now an abuser forever, no causation needs to be shown, and now you go ahead, you're strictly liable for all the other infringements. It's just a practical reality of tort law. Might it be relevant whether the degree of infringement on the site remained constant for that period?  And that's why this should all go to a jury. Right now, based upon the current record, it is not disposible. It's speculative. It sounds bad, therefore you lose. And in order for this case to have meaning and a rule that could be applied over a broad spectrum of cases to provide guidance, even if the optics of this case may seem bad to folks who read the facts, we have to have a rule that we can apply in a fair way over a broad spectrum of cases. Now, on top of that is the notion that throughout the order, the district court refers to infringing downloads and users. There is no user of Isohunt, whoever committed copyright infringement. They're all former users. You have to actually leave the site and go downstream, and then the relationship with the site is done. So organically, there is a lack of knowledge by Isohunt that's much different than, say, VEO or YouTube, where they actually have the content on the site and where they could do a filter and they could go ahead and analyze the content. Here, Isohunt can't even analyze the content. The court erred in removing the DMCA safe harbor. The court ruled, at least implicitly, that inducement trumps the DMCA, and we believe that's wrong as a matter of law. It's obviously reviewed de novo, and that the DMCA was designed to protect all forms of primary and secondary copyright infringement for online service providers. Isohunt's an online service provider. They provide a search engine for BitTorrent files. They have a tracker. So the search engine component would be protected under Section D for information location tools, and the tracker would be protected under Section A. Section A is one of the more robust protections. It's almost a strict protection. And in that situation, the court said that Isohunt doesn't qualify for Section A, even though what a tracker is, and this is in the record, is basically a routing device. The court erroneously ruled that because it didn't actually touch the content, that it's not protected. We believe that in CC, Bill, the Ninth Circuit said otherwise, that you don't actually have to touch the content, so long as you're involved in the routing of the content, that you would be immune under the DMCA, and so we would ask that you reverse the trial court on DMCA Safe Harbor Section A for the trackers. That also goes to the issue of an injunction, because the injunction covers the tracker, and it says you can't have copyrighted stuff going over your tracker, which is really a dumb switch. It's a dumb router. It doesn't really know what's going over it, because nothing touches it. So because the DMCA Section A provides the safe harbor, the injunction would need to be vacated as it applies to trackers. The court made multiple errors on the DMCA. The DMCA's analysis is not the same as an inducement analysis. Here, you'll look and see. Wasn't there also a problem before one ever gets to the specific subsections with regard to sub I and whether you were complying with set up a reasonable system for infringement? Okay. The court did find there was a tribal issue on notice and takedown. The court, there was no dispute that there was a, in the record below, that there was a copyright agent. That there was a what, I'm sorry? That there was a registered copyright agent. But there was a dispute. It wasn't disputed in the trial court in the separate statement of undisputed facts. There wasn't, again, a tribal issue on notice and takedown. The area where the judge in the trial court got it wrong is that he found that there was constructive notice under the red flags prong, which we heard about earlier, and that infringing activity was apparent. And therefore, the safe harbor was lost. But as this court in Ninth Circuit ruled in CC Bill, and as the court ruled in Veo, and the court in New York ruled in U2, you have to have specific notice in this type of context before something becomes red enough to remove it. And here, there's just gestalt manifestations of red flags that are not tethered with any foundational evidence to an actual infringement. Is it possible that one day, if this case gets reversed and it's tried by a jury, that a jury may be able to find that? Yes, based upon the record, it is. But that's not the standard here today. The standard here today is whether or not the motion for summary judgment should be granted in a chintabu. So there weren't sufficient red flags, and especially when given the notion that this site, again, does not host any of the content. It's completely subordinated to learning with specificity from the copyright owners what's infringing so they know what to do. And there's robust evidence in the record that when they got proper notice, they did take things down. Now, in terms of direct financial benefit and control, which was a hot topic earlier today as well, even if we were to look at the vicarious liability standard, and we go back to taking a look at the Ninth Circuit. But tell me where you said that the district court found that there was a triable issue of fact as to whether. . . Well, I'm here, and what I'm reading is there's one last reason why defendants are unable to benefit from the safe harbors as stated by Judge Posner. A common element is the service right of us to do what it reasonably can be asked to do. In other words. . . Oh, this is the part about the inducement liability being contradictory. But where does he say that the fact complied with that? I will provide that to you in rebuttal when I get his order in front of me. Thank you. It's in the footnote. Now, in a similar footnote, the court did find that the safe harbor wasn't applicable in a very quick analysis under the direct financial benefit and control. Now, in Perfect Ten versus Amazon, the Ninth Circuit heard, Google was found not to have sufficient control because any infringements that occurred via a search engine occurred off-site. So whether it's hyperlinks in Google going to third-party sites or hyperlinks to BitTorrent files which get downloaded and the users leave the site, the reasoning is the same, that in both instances, well, IsoHunt wouldn't be able to control the actual infringements. They occur off-site. If IsoHunt were to leave today, the same content would still be out there. So they can't control the infringements. In terms of direct financial benefit, there's a triable issue of fact on that because there's simply no analysis as to whether or not more or less ads are shown or not based upon whether or not people are looking for infringing things or not. I think one can guess that if you start looking for infringing things, maybe more ads are going to be shown, but it's also quite possible that most of the ad money is made by folks who don't download any BitTorrent files. They just go to the site and they click on an ad. So there's a triable issue of fact on that as well. You're running over time. Okay. I will stop right now and I reserve the rest of my time. That's okay. All right. Good morning, Your Honors. Paul Smith for the Plano faculties. In the case of court, the record, I think, makes amply clear that the district court had every reason to grant summary judgment to the plaintiffs in this case on their claim of intentional inducement of infringement. I think it's important to understand here that the claim here is a Brockster claim, intentional inducement by the creation of this entire set of websites that facilitated infringement on a massive scale of the plaintiffs' copyrighted works. And the evidence that it was intentionally designed to do that is extremely compelling and, indeed, is undisputed. We heard a lot about a need for a trial this morning, but there wasn't a single material fact that was identified that is disputed in this record. These were sites you would go to which had been seeded by the plaintiffs, by the defendants, by the appellants, by their own software designed to collect them, seeded with torrents, 95 percent of which were connected to copyrighted works. They would send the spider out to collect them in other sites known to be sources of copyrighted bit torrent files, like the Pirate Bay site and the Furnace Pirate Bay site. Then they would post them and they would do everything they could to encourage people to come and use their site to collect, to click on these torrent files, by, for example, putting on the front of the site the hottest of files that are being used by other users. Was that true throughout the time period? I mean, there's this causation problem which has been raised and argued somewhere. Your Honor, as I understand it, it is true that they would post the top searches and the top downloads continuously. The thing that stopped for a while was a particular thing they did called box office movies where they actually asked people to upload the torrents for the movies which were the current hot ones in the theaters. They did that for a period of time. It stopped. But they didn't stop posting what people were downloading and putting the links to those hot, those ones that people were downloading. And they were, invariably, as Judge Wilson found, the new movies that everybody wanted to watch. So right on the front of the site. What is your overall response or analysis of the causation question? Why is there? The district court opinion was a little light on this. So the question is, looking at the record as it stands, how do we find, is there a causation element, what is it, and is it here? Your Honor, the causation element, as the Supreme Court made clear in Grokster, is satisfied by a showing that you intentionally create a service or a device to facilitate infringement and that, in fact, people use it for that. The causation is simply the use of the site for infringing activity. We have this make a spree from Google, which is very nervous about that. Well, I understand that, Your Honor. They're trying to get you to overrule Grokster right here in this courtroom because they're saying you have to have specific inducement of specific acts of infringement. But the Supreme Court could not have been clearer. I would refer you, for example, to footnote 13 in the case where they say, this argument that you have to look at particular statements and particular acts of inducement completely misapprehends the nature of an inducement case. Inducement liability goes beyond that, and the distribution of a product can itself give rise to liability, where evidence shows that the distributor intended and encouraged the product to be used to infringe. What footnote was that? Footnote 13 in the opinion, Your Honor. And that is exactly what we have here, an entire operation designed, advertised, operated for the purpose of making money, massive amounts of money off people coming there, almost all of the activity being to seek out infringing works. And the Supreme Court said, overruling the old rule, which this Court had applied that you need specific knowledge and specific infringements, they overruled that and said, if the device is put out there for that purpose, then everything that happens as a result is your responsibility. And you do not have the obligation at that point to identify particular infringements that you specifically induce with a particular message. In fact, the Supreme Court said in Brockster, you don't have to have a message of inducement. If the product is put out there or the service is put out there for the purpose of inducing it, responding to a known source of demand for infringement, with a business model that would profit from infringement and with a deliberate avoidance of the filtering opportunities that exist that would prevent infringement. So when you have an intentionally abusive business distributed to make money for this purpose, that's all you need to show, in addition, of course, to showing that there was, in fact, massive infringement as a result. There's some language, for example. I mean, it gets a little murky because the footnote says, as you say, that it talks about intent, but then it says, where evidence shows that the distributor intended and encouraged the product to be used to infringe. They encouraged, and the next sentence again talks about encouragement of infringement. So I understand, as I was saying to your opponent, that the distribution of the tool itself is a large part of it, but isn't there some public communication of this intent that's required? Well, Your Honor, if you look at the entire Section 3 of the opinion, Section 3A, it begins with the only apparent question left is whether you have to have some message of inducement that has been communicated to the users. And the Court answers that question, no. It says there often is. That's the classic case. But it goes on to say even if there is no communication of an inducing message to users, you can still find intent to induce and liability where they respond to a known source of demand and reasonably anticipate that people will use their device or their service that way, where they have a business model that profits from that and where they deliberately avoid filtering that could solve the problem. We have all of those here. And so I think the Supreme Court was extremely clear that we're not talking about one-on-one communications or indeed talking about communication at all. We're talking about a device which is intentionally put into the stream of commerce or a service that is set up intentionally to do exactly what this site did, which is produce a massive amount of copyright infringement. So then it seems like because Grokster so clearly answers that question here, the only remaining question, which Grokster didn't address, is whether the defendants here can somehow escape liability under Grokster as a result of the DMCA and the safe harbors that were created there. And I submit to you that that cannot be the right interpretation of the statute, that Congress in the DMCA drew a balance and said very clearly that it intended to maintain strong incentives for service providers to cooperate and to avoid copyright infringement, that this is not a one-sided statute, and that that balance would be completely destroyed if you find the DMCA being sufficiently protective that it protects even intentional facilitators of infringement of the kind we're dealing with here. Indeed, I think that the very language we were talking about before that exists in both 512C and 512D, the by reason of phrase, is the reason why you can't extend DMC immunity to intentional inducers of infringement. The liability in this case was not by reason of the fact that he was providing links to other places on the Internet. It was by reason of the fact that he set out to induce infringement and designed his business that way. And you kind of walked into yourself. I mean, in the sense that if you're going to take a very narrow view of – and I'm not saying this is wrong, but if you take the view of Grokster that you do, that is, that it's essentially intent plus a device that lends itself to infringement plus a lot of infringement, which is what I understand you to be saying. That is what the Court said. Then it seems to me that you can't say that the infringement was by reason of the intent. It was by reason of this set of things. I mean, you can have an intent which can be, you know, not very implemented. So once you cut out the message and the encouragement and so on, it seems to me that you have a hard time saying that there is something else going on for the by reason of language, if you think the by reason of language applies at all to this sort of thing. Well, Your Honor, I think the intent is the critical thing under Grokster. And I think you can say that. It is. But the question is how do you then back out that consideration when you get to the DMC? Well, you know, there's a couple of ways to get there. One is to focus on the by reason of language. But even if you don't find that persuasive, I think you then have to proceed and look at the actual terms of the safe harbors. And if you look at 512D, I think it's important to understand there are three different exceptions here, not just one or two. The first one is the so-called knowledge or awareness exception. And an intentional inducer who sets up his business in order to attract infringers, facilitate their infringement, profits from it in a massive way and avoids filtering, is going to have sufficient knowledge or awareness for purposes of the DFCA. What the statute says is you do not get to have the protection if you have actual knowledge of infringement on your site, or even if you don't have actual knowledge, if you're aware of facts or circumstances that would lead somebody to understand that it's apparent that there's a lot of infringement on your site, and then you don't do anything to stop it. That's the first of the three exceptions. And I think that exception, which Judge Wilson correctly said, applies here because somebody who is a broadster inducer, who's engaged in this business over a period of years, has advertised the top box office hits that people are downloading, come get them here, here's your link, you too can, like your friends, get the newest, latest movies at my site, obviously has both knowledge of infringement on the site, or at a minimum awareness of facts or circumstances for which infringing activity is apparent. His entire website was infringing activity. That was what it was for. So that is the exception that I think applies here. And I think it's important to keep the knowledge and awareness exception separated apart from the notice of takedown notices. And the answer to your question, Your Honor, with respect to the takedown notice, which is the third exception, and what Judge Wilson said about that, it's in footnote 27 of Judge Wilson's summary judgment opinion. That's page 67 of the record excerpts. And he goes on in that footnote to address the second exception, the financial interest, right and ability to control exception, and finds that it applies. But he says that there is a triable issue of fact with respect to the way in which takedown notices were delivered to the defendants in this case. So he wasn't going to rely on the third exception. I gather that you didn't litigate the separate subsection I, conditions for eligibility section? Right, Your Honor. We did not raise a claim about repeat infringers or whether they had a DMCA agent listed. Those are not issues that were raised in this case. So the case was focused on these exceptions, and in particular, the knowledge exception and the right and ability to control and financial interest section. And so I think that once you look at those things and realize you have to have three exceptions, then you look and see, well, what is it that the defendants are saying about knowledge? And what is it that, frankly, Google is saying about knowledge in their brief? What they're basically saying is, we're going to go back to the pre-Graster rule. You have to have knowledge of a specific user downloading a specific work on a specific day, and otherwise you don't have enough knowledge and you don't even have enough awareness to constitute awareness within the meaning of the first exception. That would effectively overrule the Graster decision and make the exception meaningless. And what you have here is an effort to try to basically eliminate from the statute both the knowledge exception and the right and ability to control exception, basically turn the statute into a single exception where if all you do is respond to takedown notices, you're spot free, and you can continue to run a business for the rest of time, a business that profits from other people's intellectual property, which you get for free because people put it on their site. I gather, I mean, the district judge seemed to be saying that there is an inherent conflict between the inducement claim, if successful, and any application, and any argument that A1 and 2 don't apply. That seems a little tough. Well, Your Honor, he did go on to say that as a kind of conclusion to his analysis, but that was after a couple of pages in which he went through. That's not what you're saying. I actually do think that's true, and that will end up being true, and that you read the note. It may turn out to be true, but you still have to run it through the actual statute. You could do it either way. My personal view, based on the by reason of language, is that you don't have to do that. But if you don't find that persuasive, then you run it through the knowledge and awareness and the right and ability to control sections. And I think it's pretty clear that if you read both Groster correctly and you read the knowledge and awareness prong correctly, you're going to get to the same place, that there can't be somebody who has operated a Groster business, who doesn't have sufficient knowledge and awareness or right and ability to control, combined with financial interest, to get them outside of the protections of the DMCA. It basically will get you to the same answer, one way or the other. So I think there is no causation problem here, and I think that it really would be inconceivable that the court would find that the DMCA, the Congress and the DMCA set out to protect the kinds of businesses we're dealing with here. Let me just address, although the district court did it very briefly, the second exception, which is the right and ability to control infringement and the direct financial interest. I think it is clear that any site that is advertising supportive and attracting a lot of users as a result of the availability of infringing works satisfies the direct financial interest prong. And that's a rule that this court has recognized a number of times under vicarious liability. And it went on to say in CC Bill that the rule is exactly the same for purposes of the DMCA. If you're using infringement as a draw to users and making money from that, then that's a direct financial interest. That's a rule that's been around for decades and decades. It goes back to music hall cases where the band would play somebody else's songs and they would find that the owner of the dance hall was responsible because of the direct financial interest of drawing people in. The only slightly more complicated question is what's the right and ability to control and is it in this statute a higher standard than it is under the common law? We haven't taken a position on that in this case because we think that even under the cases which say you need right and ability to control plus something, a heightened level of right and ability to control, clearly the defendants in this case had that since the primary source of the infringing torrent files on their site was them, their own software which they designed to go out and gather the stuff in. They also had the ability to filter and find these sites by using keywords if they wanted to. So there was obviously no issue here about the real ability as a practical sense to control it, not simply the theoretical ability to take it down once you find it, but the actual ability to find it, to know it's there, and if you wanted to, to operate a site in which you avoid to a substantial extent if not 100% infringing material available if you wanted to. But since they didn't want to, they didn't do that. So I think that the right and ability to control language may or may not have this plus up element in it, but either way it still has to be applied in a way that's practical and looks at whether or not people are deliberately making money and deliberately avoiding remedial measures that they have available to them that would constitute right and ability to control. And so I think Judge Wilson was correct in finding that in this case, that exception to the safe harbor under 512D also applied, and that therefore there was sort of ‑‑ A record dispute about that question, i.e., could they have known what was there and taken account of it? The record dispute, as I understand it, is whether or not keyword filtering would have identified all of the copyright infringing material at a time prior to the injunction when the list was not available to them to use. Our experts said that they could have gone out and gotten their own list of what the most popular copyrighted material is and searched for that and taken it down. These torrent files have file names which the users use to search for them. And so if you want to go in and find a movie, you search for it by name, and it's in the name of the torrent file. So it's not like it's all that tough, at least if you wanted to, to greatly minimize the amount of those kinds of files available. Now, there was some dispute about whether that could be fully effective, but I think in this case where it is the defendants who are, in fact, putting the stuff up, this isn't primarily a user‑generated site. This is a site that is supplying the seeding itself for the benefit of attracting people, basically trying to create a magnet for users that the right ability to control element is satisfied by that alone, and that the keyword filtering issue, to the extent there wasn't a dispute of fact, shouldn't be itself a problem with the application of that exception. Do you want to briefly comment on the scope of the injunction? Your Honor, I think it was quite properly tailored to focus only on infringement in the United States. It is quite expressed that it's only focusing on infringement in the United States, and it adds in addition the elements of knowing infringement. And so what Judge Wilson said was with this technology, there may be some extraterritorial effect, and in particular, if the defendants provide a torrent file to some foreign user who then proceeds in the way this works to deliver that material to a U.S. user, then they have continued to cause infringement in the United States and that they have an obligation to avoid doing that. And I think the basic principle is that you can enjoin activity of people overseas who are effectively facilitating infringement in the United States. In fact, the injunction, I think, could have been much broader properly. If you look at a case like the creative computing case, which we cited, which is a Ninth Circuit case, it said when you have abusive defendants like this intentionally violating other people's rights, it is perfectly proper to have a broad prophylactic injunction designed to avoid further violations of people's rights. But here the injunction is carefully tailored, as one can imagine, to the scope of what's lawful in terms of infringement in the United States. And so I think it is a quite reasonable injunction and it shouldn't be a problem. Some of its meanings are still being teased out in the contemporary seating that's happening in the district court. But in terms of what it says on its face, I think it's completely an objectionable error. Any further questions? Thank you. Thank you. Let's see what time you've got. Well, we'll give you a minute. Thank you, Your Honor. To even it up. I appreciate it. Okay. In response to counsel, this case is not like Grokster. Grokster was a device. They had no DMCA immunity at all because they didn't fit any of the four categories. The Supreme Court mentioned that Napster, their advertisements to Napster users were a massive draw. Grokster cut the umbilical cord and sent it out and had no ability to be able to take any works down at all. And they were on a closed network. And BitTorrent here is an open network. In terms of the injunction, under FRCP 65, this is not narrowly tailored. It does have an extraterritorial effect. The keyword, in essence, the keyword filter is overbroad. It gets rid of digital rights management works. It gets rid of fair use. It gets rid of Alice in Wonderland, whether or not it's the copyrighted work or the public domain work, or Winnie the Pooh, and all those things are in the record. It also, it's very difficult to be able to implement in the sense that in order to be able to know if something's actually infringing, it's a matter of contract law. It's not whether it's copyrighted or not. It's whether it's authorized or not. And you can have oral agreements that put things on the net for marketing reasons and all sorts of other things. And so a search engine can never be privy to what's authorized or not unless someone tells them about it. The assumption they have to make is that it's authorized. Did you ever make a motion to modify the injunction with specific proposals as to alternative language? Twice. The first one wasn't actually a motion to modify. It was us giving to Judge Wilson our form of what we thought the injunction should be, and that he declined the invitation for that. We then did an ex parte application to modify the injunction. He did acknowledge that the keyword filtering was overbroad, and he did ask the studios to provide more detail. But we still have the same problem. What it basically comes down to is that getting keywords punches a hole in the dictionary. I mean, you get words like 21 and The, and even Avatar. There's plenty of things that have Avatar in it that aren't the movie, especially computer-related things. And so it's overbroad. It also impacts the First Amendment. And then on top of that, there's no end in time. If it's going to be narrowly tailored to, say, stopping and inducement, it should have a number of years in it. This is forever. I mean, we won't even have this Internet in the way it is 20 years from now. And Mr. Fung, for the rest of his life, is subject to this injunction. And that's inherently overbroad and not narrowly tailored and inconsistent with Rule 65 and the Supreme Court's guidance on how injunctions ought to come about. We have the extraterritorial issue, if I can address it for a minute. We have an issue here where the court's indicating that if there is a Web site in Canada where Mr. Fung and ISIL Hunt are located, and if you put up an IP address firewall so that no one from anywhere in the United States can ever access it, but if you make available a torrent file to, say, a Canadian citizen, and they leave ISILHunt.com, and then they happen, after they leave, to go into a swarm where there's at least one American who's providing some of the information, the judge seems to indicate that that would still mean that ISIL Hunt, extraterritorially, has to follow this injunction, even though ISIL Hunt never communicates with an American, never communicates with a U.S. resident. Now, if we look at SUBA films, for guidance, this has got the minimum going to create a conflict of law, because right now, as you see in the record, there's litigation going on in Canada over whether or not these communications in Canada with other Canadians and people in Europe, whether or not that could be considered illegal. I want to wrap it up, please. So we would ask that you reverse your amendments to the trial court. We appreciate it. Thank you. Thank you very much. Thank you, counsel. And this court will stand adjourned. Thank you. Court is adjourned.
judges: Pregerson, Fisher, Berzon